Good morning. May it please the court, my name is Alan Campbell and it's my privilege to represent Ernest Kar in his direct appeal challenging convictions for bank fraud and conspiracy to commit bank fraud. The first issue I'd like to cover is that the court erred in denying Mr. Kar's multiple requests for assignment of new counsel. These requests started actually before he was indicted. He was arrested on a complaint and approximately three months later he filed his first motion for new counsel which was denied after an off-the-record hearing. He was indicted a few weeks later and at his arraignment he made a verbal motion for new counsel. At a hearing for that one approximately a week later he did withdraw that complaint saying that he and counsel, it appeared that he and counsel had reconciled their differences and he was willing to continue with her. That didn't last very long. About a month later he filed his third motion for appointment of new counsel. At this point trial had not yet been scheduled. After a hearing it was denied. Then approximately a month later he filed his fourth request for appointment of counsel. And it's Mr. Kar's position that the court abused its discretion in denying these motions? The record suggests that there were multiple inquiries by the magistrate judge and a district court judge were involved here and that the inquiries on all those occasions as to what the problems were in the relationship were exhaustive. That's certainly how the government characterizes it. What was inadequate about these multiple inquiries into the problems in the relationship? It's a three-factor test and certainly the adequacy of the inquiry is one of the three factors and that's the one that probably supports Mr. Kar the least because there was an inquiry into each of them. We could question whether or not it was exhaustive. The first one we don't know what happened because it was off the record. The second one really is irrelevant because Mr. Kar withdrew his motion. During the third and fourth ones there certainly was an inquiry. There's no denying that. There were instances when Mr. Kar was trying to raise additional grounds in the court. They've been cited and I'm sure you will read the transcript pages on this. It's pretty short. The court tells Mr. Kar several occasions things like stop, stop, stop. I'm not listening to you. I've heard enough. You weren't invited to speak. So I don't know if they were exhaustive but there certainly was an inquiry. It's really the timeliness and the breakdown of communications and the ability to prepare a defense that are the stronger problems for Mr. Kar. The government makes the point that you can't have a client who arguably orchestrates a breakdown in communication and then argue because he is so unwilling to engage with his counsel despite all the efforts of counsel to communicate, to do the job. You can't translate that into a breakdown in communication. Otherwise, clients such as yours could orchestrate. I would certainly agree with you. However, that's not what happened in this case. One of the primary concerns, one of the strongest things that counsel could have done for him was advise him on a plea. All counsel did was tell him what the statutory maximum was. The counsel didn't go through the guidelines with him and tell him what the ranges would be if he were to plea. If you're a defendant looking to decide whether or not to plea, what potential time you're looking at is perhaps the most important decision for you. And that's something that simply didn't happen in this case. And he asked for that repeatedly at the hearings and the court heard that he wanted to know the range and simply said the probation department isn't going to do a pre-trial, a pre-sentence report beforehand. Probation didn't have to do that. That's something his attorney should have done. You get the record, you go through it, you figure out, you get an idea of what the offense level would be, you get an idea of what your criminal history is going to be, then you negotiate with the government as to what enhancements there will be, what the range will be. And that's something that according to the record did not happen in this case. And it's clear that Mr. Carr was interested in pleading. This was mentioned several times in pre-trial hearings that he was interested in pleading. But all he knew was the statutory maximum. He didn't have any idea of what he would get by pleading. And as for orchestrating it, again, before he was indicted, he was expressing his dissatisfaction with his attorney. Typically with these cases, you see somebody on the eve of trial saying, oh, wait, I don't want to go to trial. So they say, I'm not happy with my lawyer. I need a new lawyer. From before day one, day zero, he's saying, I'm not happy with having a new attorney. And some of the complaints may have been minor. Getting mail from another client in and of itself might be a minor thing, but that certainly goes to his confidence in whether or not his attorney is representing him. Affiliated monthly defense, maybe there wasn't a grand defense, but every case has a defense, even if the defense is let's put the government to their test. I thought part of the complaint was that counsel had not negotiated a plea agreement to his liking. That's part of your case. He does make several complaints, yes. And if that is so, then obviously she discussed pleas with him. And we can't have a situation where, as Judge Lopez just suggested, where he simply says, she didn't try hard enough to get me a plea, which I can accept. And again, I would agree with you, but that's not this case. There wasn't a range of sentences. She may have said there's a plea offer. On this record, all he was told was what the statutory maximum was. He was not told what the likely time he would serve if he was going to accept the plea. And as I mentioned, that is perhaps the most important consideration when you're deciding whether or not to accept a plea, is how much time am I going to get. So are you conceding that there was a plea offer? Wouldn't that have had some kind of reference to the offer for the time considered? On this record, no, there's no indication. The statement is, all she told me was the statutory maximum. And Larson, who filed various responses to a complaint, never said, I told him what the range was. She doesn't dispute that. She disputes other things, how many times they met, whether she'd said in discovery, things of that nature. But as to this critical issue of how much time he was looking at if he accepted the plea, the only evidence in this case is that he didn't know what the range would be. But notwithstanding the range, is there evidence in the record about what the details of a plea offer are? I don't believe there are any, there is discussion that there was a plea or some discussion of a plea, but there's nothing on the record that I, I believe there's nothing on the record that goes into the substance of what the plea discussions were. And then, unless there are further questions on that issue, I'll touch the second issue in the last couple minutes remaining, in the slightly related issue in that the court erred in allowing Mr. Carr to go pro se. And that's not the complaint. The complaint is that he didn't have an unequivocal waiver of his right to counsel. And that's based, just after the court allowed his, the court, as you folks are probably aware, the court denied his motion, sent the parties away, and then reconvened the hearings saying I reconsider my own, and they'll allow you to represent yourself. Mr. Carr almost immediately says I just need a lawyer to prepare a defense. A week later during jury selection, there's some discussion with the court, Mr. Carr mentions that he was forced to go to trial, I'm sorry, that he was forced to go pro se, that he didn't want this, that he wanted an attorney to represent him. And the government points out that immediately after he says he was forced to go pro se, but he then reiterates that I choose to go pro se. If you look at page 38 and 39 of the government's brief, they go through, both in terms of written motions from your client, things that he said during his hearings that suggest there was nothing equivocal at all about his desire to go pro se. So I get it's an exhaustive recitation of what was unequivocal about, so how in the face of that can you say there was anything equivocal about his request to go pro se? So three sentences before he reiterates that he chooses to go pro se, he discusses how he filed many motions to have a new counsel appointed, he wanted an attorney, so that led me no choice but to go pro se, I've been forced to represent myself, it's not my own choice, but they forced me to do this, I'm not even prepared for trial. I would say that that is not equivocal language that he wants to go pro se. What was clear is that he wanted an attorney other than his current appointed attorney. And my time is up, so if there are any other questions, I will rest on my brief. Thank you. Thank you. Good morning, Donald Lockhart for the government. On the first issue, the motion for new counsel, and specifically on the defense point that the record is unclear about whether a defense attorney was giving the proposed plea agreements to Mr. Carr. Page 131 of Volume 1 of the appendix is the written response by Melissa Larson, his counsel, to some of the complaints that Carr made. In that she says a number of things, including counsel for the defendant has presented each plea agreement, some multiple agreements, provided to her by the government, to the defendant, met with him 13 times, not the two that he alleged, and on the question of what defense counsel may have explained or not explained in terms of the guidelines, the record is unclear on that point. All the record suggests is that Carr said that counsel had not adequately forecasted the loss amount in the case, not that she hadn't spoken with him at all about the guidelines. So there's a narrow issue that clearly was bothering Carr about the proposed loss that he was facing in the case. And the district court addressed that with Carr and basically said, look, we can't know for certain exactly what the loss is going to be at this point. So the record does not support the idea that there was no discussion at all concerning the guidelines ramifications that Mr. Carr was facing. But more broadly, the record shows that there was actually abundant communication between the two of them during the early phase of the case when counsel was negotiating a plea on behalf of Carr. The two of them were clearly communicating together. The record reflects that. The record also reflects that Carr withdrew his initial motion for new counsel, saying that he was optimistic that they could get along. You then have the fact that Carr and Larson met at least eight times before trial. She corresponded with him 13 times at the impoundment. When Carr was, by that time, representing himself, they had at least seven further conversations. During the trial, they had 83 conversations at least, and then there were 12 further conversations that they had at sentencing at least. So the record actually indicates that they were talking quite a great deal even after Mr. Carr decided that he would go ahead and represent himself. So the record just doesn't support the idea that there was a complete and irrevocable breakdown in communication. So that's the main point that we have on that issue. Unless the Court has questions on it, we'll go to the Feretta issue, whether the Feretta waiver was sufficiently unequivocal. There are several categories of evidence to look at. First and foremost is the written motion, the pro se motion that Carr filed himself in which he is citing to the Feretta decision and explaining to the judge that you're going to have to have a colloquy with me under Feretta because I want to represent myself pro se. So he's obviously very well aware of his rights under Feretta, and he says in the same breath that he thinks it's in his best interest, his words, to represent himself and that he would like Attorney Larson, in essence, to serve as his standby counsel. So this is somebody who not only understands his rights under Feretta but is advocating them very forcefully and even appreciates the distinction between regular counsel and standby counsel, and he wants Larson to operate as standby counsel. Then we get to the January 29th hearing where he says, I would like to exercise my Sixth Amendment right to represent myself, to go pro se. He says, I have the right to represent myself. She's not my attorney. It's my Sixth Amendment right. And granted, in a few places he says things like, well, I've been forced to go pro se, in essence, because you denied my motion for new counsel. But right in the same breath, each time he says, uses that language, he goes on to say, I choose to go pro se, and in the second instance, I'm going to go pro se. So each time he uses that forced to go pro se language, right on the heels of that, he's saying, I choose to go pro se, and I'm going to go pro se. So again, it's an unequivocal waiver of his right. And Mr. Larkin, let me just ask you briefly about it. It's not raised by opposing counsel that this refusal to remove a juror issue. This is more, I guess, a practical question. I mean, the government discloses that a paralegal sitting at a counsel table knows juror number one. In light of that, the court explores the relationship. And it turns out that it may be that juror number one had done some babysitting for the paralegal's sister a couple times for the paralegal. And the court then conducts an inquiry to determine whether, despite all that, the juror can be fair and impartial. But my question is, and the court does not remove the juror. So we have this issue on appeal now. I don't know if the jurors have been sworn in. The trial has not yet begun. There are two alternates available. Why wouldn't the prosecution, in light of that disclosure, if they thought it was important enough appropriately to acknowledge the relationship, why wouldn't the prosecution just agree to have that juror removed and have an alternate sit, rather than creating an issue that we have on appeal? So it just seems there's a certain lack of practical judgment at that moment that is troublesome. Well, what the record reflects is not that the prosecutor opposed it. I think what the record reflects from memory is that the AUSA was silent on the issue. But you're right. The AUSA could have affirmatively supported the defendant. But the way it unfolds pretty rapidly with the defendant asking for the juror to be removed and then the judge really almost in the same breath denying that motion, it's not even clear that there was much of an interval. I thought there was an inquiry of the juror. Oh, there certainly was. And the inquiry, as we would contend on appeal, revealed some fairly benign circumstances. And so I suppose it's understandable that the prosecutor in that circumstance, given what emerged from the inquiry, did not affirmatively ask for the juror to be removed, sort of decided to see what the defense position would be. And at this time, remember Carr is representing himself, and Carr asks for the juror to be removed. And I think it's really almost in the same breath the court denies that motion. So the question is whether the AUSA should have asked the court to reconsider on the record. It's a ticklish situation to be in as a prosecutor asking a judge to revisit an issue that the judge has already really just ruled on, in a situation where the circumstances really aren't that problematic. And we go into that in the brief. The juror was just a social acquaintance of the government's paralegal. They met only infrequently was the word that the juror used. The paralegal, the government proffered that its paralegal had said that they only met about once a year or something like that. The juror had babysat maybe once or twice for the paralegal and had also babysat for the, and her sister rather had also babysat for the paralegal. But those aren't circumstances that implicate either implied bias or actual bias. So the more practical point and something we should have done was. If the juror had babysat for the prosecutor's children. Same result I think. I mean I think it really, it's very context dependent. I mean I suppose it depends how much if this was a. Why? I'm sorry. Why? Well because there's not a huge difference institutionally between the role of the AUSA and the role of the paralegal. That distinction in their roles shouldn't. I'm saying why does it matter if the juror babysat once or twice only? Well because it shows that the frequency of their interactions is seldom. Meaning once a year I think is what our paralegal proffered. What about the quality of their interaction? I'm sorry. What about the quality of their interaction? I mean we all have friends we only see once a year but the quality is significant. But the judge inquired into that. And the result was that they knew each other only you know occasionally, very infrequently. And there's nothing to suggest beyond the babysitting that there was any sort of further social interaction between them. There was a suggestion of maybe they were on the same social media network together. But that was the extent of it. So it really goes to I mean the frequency of their interactions I think is important. And the content of the interactions I think is implied in part by the frequency. But beyond that I was about to say one practical thing we could have done is we could have listed the paralegal during jury impoundment. If there's any practical point that my office has learned from this it's list the names of the prosecutors, the case agents, your witnesses and your paralegal because we did neglect to do that at the jury impoundment. And the paralegal wasn't there during the jury impoundment. She only came for the first day of trial and that's when she saw the juror who she knew she knew. And so if there's any sort of practical takeaways we have to be careful to list the names of our paralegals when we have jury impoundment. Thank you.